IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AVIS JEANETTE JONES, | : | |
|     Plaintiff | : | |
| | : | |
| v. | : | Civil No. AMD 05-2853 |
| | : | |
| EDWARD D. JONES & CO., L.P., | : | |
|     Defendant | : | |

...o0o...

MEMORANDUM OPINION

Plaintiff Avis Jones ("Jones") was employed as a Branch Office Administrator by defendant Edward D. Jones & Co., L.P. ("Edward Jones") for approximately 6 years before her termination on June 21, 2004. Plaintiff brings this action against her former employer alleging: (1) hostile work environment discrimination based on sex pursuant to Title VII; (2) disparate treatment race discrimination pursuant to Title VII, 42 U.S.C. §2000e, *et. seq.* and 42 U.S.C. §1981; (3) disparate treatment discrimination based on age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §621 *et seq.* ("ADEA"); and (4) intentional infliction of emotional distress under Maryland law (which has been abandoned). Discovery having concluded, defendant has moved for summary judgment on all counts. A hearing has been held and the briefing on the motion has been thoroughly reviewed. For the reasons stated within, the motion for summary judgment shall be granted.

I.

Jones is a black female more than 50 years old who was employed by defendant Edward Jones from July 1998 to January 2001 in Georgia, and from March 2001 through June 2004, during the latter period in its Reisterstown, Maryland, office. Importantly, the

basis for plaintiff's complaint is her bad relationship with another of defendant's employees, Tom Custance, a white male, and focuses virtually exclusively on the time period between June 8, 2004, and June 21, 2004.[1]

Edward Jones is a full-service retail investment brokerage firm headquartered in St. Louis, Missouri. The company's business model is unique: two-person branch offices in various communities and cities around the country, which operate pursuant to managerial and administrative direction from the St. Louis headquarters. Branch offices are normally staffed by one Investment Representative ("IR") and one Branch Office Administrator ("BOA"). This unique organizational anatomy resembles a tandem bicycle: the "captain" sitting in front must be an experienced cyclist and possess good judgment while the "stoker," sitting behind, serves mainly as the bicycle's motor. While captain (similar to an IR) and stoker (similar to a BOA) have different responsibilities, successful operation of the tandem bicycle requires that each rider serve as an equal participant. For Edward Jones to provide personal, individually-tailored financial services to its clients, this means the IR and BOA must work well together as a team.

An IR is responsible for selling investments such as stocks, bonds, mutual funds, IRAs, certificates of deposit and insurance, and for running a legal, profitable and ethical office. The primary duties of a BOA, whose role is to help the IR meet customer needs, involve customer service, marketing support and office administration. BOAs are encouraged

---

[1] Plaintiff confirmed in her deposition that she is not complaining of any incidents that occurred before June 8, 2004. Jones Dep. pp. 46, 181, 184.

to routinely contact headquarters regarding any problems they encounter in their respective branch offices. To this end, Edward Jones maintains strongly worded, comprehensive Nondiscrimination and Sexual Harassment Policies, which provide for investigation into alleged incidents. Plaintiff received and acknowledged her receipt of the policies at the start of her employment on March 22, 2001. These policies remained in effect throughout Jones's employment with defendant.

While IRs assign job duties, supervise, and complete performance appraisals for BOAs, any discipline or discharge issued to a BOA comes from the St. Louis headquarters. An IR retains no authority to discipline or discharge the BOA working in a particular branch office. Instead, the Associate Relations Department conducts an independent investigation of an associate's conduct, including an interview with an associate, before making discipline or discharge decisions.

On or about July 1, 1998, defendant hired Jones as a BOA in its Norcross, Georgia, office. In January 2001, plaintiff resigned from the company, moved to Maryland, and, in March 2001, accepted a BOA position with the Reisterstown, Maryland office. The Reisterstown IR was Cory Yager. In 2002, Yager left Edward Jones and was later replaced by Tom Custance in January 2003.[2] Plaintiff's job duties did not change when Custance took over as IR. From the time he was approved to sell securities, Custance was required to meet certain production standards, which increased from month to month.

---

[2] Custance was hired as an IR in February 2002, trained, and permitted to sell securities beginning on July 8, 2002. After working out of his home for several months, Custance was assigned to the Reisterstown office.

In March 2003, Custance gave plaintiff her 2003 performance appraisal. At the time, Custance had been working as an IR for less than 3 months. However, he was instructed to base his appraisal on Jones's previous nine months of performance, which largely required Custance to rely on Jones's self-reporting of her job performance. Accordingly, while Custance rated Jones as "exceeding expectations," he also included several suggestions for skills he thought plaintiff needed to develop or tasks he felt should be better performed in the office. Importantly, Custance testified that three-quarters of the 2003 performance appraisal was based on information he did not know personally.

By March 2004, Custance's "four-month rolling gross commission average" failed to meet defendant's expectations for an IR of his seniority, prompting Edward Jones to impose new goals on Custance for March, April, May and June 2004. If Custance failed to meet any of these goals, he was subject to discharge. Custance advised plaintiff of these new production goals. While plaintiff denies she knew Custance would be discharged were he not to meet those goals, Jones was generally aware that Custance had certain performance expectations that had to be met, and that he was subject to discharge if he failed to meet those expectations.

Because the profitability of a branch depends on the teamwork and job performance of both the IR and BOA, it was Jones's responsibility to help Custance meet his production goals by bringing prospective customers in the door so the IR could sell securities to them

and open new accounts.[3] Jones's presence in the office and her adequate performance would help Custance achieve these goals. Custance's view was that plaintiff was not meeting these standards and therefore did not help Custance achieve these goals.

Pursuant to Edward Jones's policy on Reporting Hours Worked and Time Off, plaintiff had a responsibility to keep accurate time records. Failure to do so was a dischargeable offense. Prior to June 2004, plaintiff had placed a copy of her time cards in a file folder on Custance's desk. However, because Edward Jones's time card reporting system is based on an honor system, Custance did not feel he needed to review Jones's time cards each pay period. On or about June 8, 2004, however, Custance reviewed Jones's time cards and discovered that, although plaintiff worked from 8:00 A.M. to 4:30 P.M. with an unpaid one-hour lunch, she was recording eight hours worked on her timecard each day while working only seven and a half hours each day. For three and one half years, plaintiff had been reporting an extra half-hour per day on every timecard in violation of Edward Jones's timecard policy.[4]

When Custance had begun working in the Reisterstown office in January 2003, plaintiff had advised him that because her mother was ill, she would have to be out of the office at times; she had promised to make up that time. In spring 2004, Custance began

---

[3] Ultimately, Custance met his production goals and Edward Jones removed him from the goals program in late 2004.

[4] In her deposition, plaintiff's only response to inquiries related to timecard falsification is, "I was recording it as I saw fit, and I didn't see any problem whatsoever, because it wasn't brought to my attention. I did not assume . . . that I was falsifying or not on the honor system." Jones admits, "[she] was putting eight hours, but it was actually seven and a half." Jones Dep. p. 359-363.

observing problems with plaintiff's attendance. Because a reliable BOA was necessary to Custance's reaching his production goals, Jones's erratic attendance and unscheduled, unplanned absences made it difficult for Custance to meet his production and profitability goals. Plaintiff's shortcomings contributed to Custance's problems with both production and profitability.

Accordingly, Custance began tracking the amount of time plaintiff was out of the office.[5] On June 3, 2004, Custance called defendant's Associate Relations Department in St. Louis to discuss his ongoing concerns regarding Jones's unsatisfactory attendance and advised Angela Groves that Jones had been absent from work on several occasions recently, including 17 hours the previous week. That same day, plaintiff left early for lunch and did not return before Custance had to leave for two out-of-office appointments from 12:30 to 3:30 P.M. When Custance returned, there were five messages on the office voicemail.

On June 8, 2004, according to Jones, Custance told Jones that he was "fed up, [and] he couldn't take it anymore." He elaborated that "it was totally frustrating, he understood about [plaintiff's] mom being ill . . . but the job came first." Custance scheduled a conference call with Edward Jones's Associate Relations Department during which defendant noted that plaintiff had exhausted all her sick leave. Plaintiff responded by insisting she "annotated

---

[5]Plaintiff admitted she often arrived late in the morning, left early for lunch, and left early before the end of the workday. Jones Dep. pp. 58-59, 61-62. Several times plaintiff was absent in the middle of the day for personal reasons, physical therapy, or taking care of her mother. Jones Dep. p. 61. In February 2003, during a period of heavy snow, plaintiff did not come to work for an entire week, alleging she believed she did not need to come to work as local schools were not open (despite the fact that the roads were clear). Jones Dep. p. 174.

[her] sheet wrong," noting certain days off as sick leave, when in actuality they were Jones's vacation and/or "Personal Days."

Custance explained to Jones that her excessive absenteeism was having a negative impact on business, that Custance needed the office to be staffed for eight hours a day, that she needed to give as much notice as possible before taking time off, and that if she needed to, she could take intermittent Family and Medical Leave to care for her mother.  Plaintiff responded to these directives rather bitterly, shouting expletives at Custance and leaving the office immediately thereafter. Custance notified management, and Jones was referred to defendant's Employee Assistance Program, where plaintiff spoke with a counselor.

On June 11, 2004, Custance gave Jones her 2004 performance appraisal, portions of which rated her performance "unacceptable."  Jones contacted defendant by phone and reported that Custance walked out of his office and tossed the review on her desk, whereupon defendant informed plaintiff she could file a rebuttal to the appraisal.  While plaintiff was on that call, Custance also asked plaintiff to return the key to his personal office. This request upset plaintiff and prompted Edward Jones to bring an Associate Relations Team Leader, John Sullivan, onto the call.[6]

On or about June 15, 2004, Custance and Jones discussed her appraisal.  Plaintiff disagreed with the appraisal and planned to file a rebuttal. When they reached the section on

---

[6]Defendant points to numerous other specific incidents corroborating plaintiff's less-than-satisfactory job performance: failure to mail client checks; printing only 200 newsletters when she should have printed 1,200; failing to improve her "product knowledge," as strongly suggested by Custance in his 2003 appraisal.

-7-

attendance, plaintiff said she wanted to skip it because she "understood." Groves and Terry Coppotelli, team leaders in the Associate Relations Department then teleconferenced with Custance to discuss continuing concerns with Jones's work performance. They then brought Jones onto the call and advised her about timecard issue (i.e., recording eight hours while only working seven and one half), and specifically that timecard falsification could result in termination. They indicated they would investigate the matter and get back to Jones. They also advised Jones that they had decided against issuing a written warning for her excessive absenteeism, but that if her attendance did not improve, she would receive a written warning.

On June 17, 2004, plaintiff, Custance, Groves and Steve Rarick, another team leader, participated in another conference call, during which four specific issues were discussed and performance expectations for plaintiff clearly enumerated: (1) timecard falsification (specifically that, going forward, plaintiff must only clock seven and one half hours and not eight); (2) plaintiff's absenteeism (specifically, Jones was advised she could apply for Family Medical Leave for the time she was absent to care for her mother); (3) plaintiff's unmet performance expectations (unissued checks, newsletter problems, and, going forward, defendant's expectations that plaintiff take more time in completing tasks to ensure quality and attention to detail); and (4) that the office would close for the rest of the day, and remain closed Friday and Saturday (June 18-19, 2004) because Custance was leaving to attend a regional conference. Groves and Rarick told plaintiff she should not come into the office but that she would receive time off with pay during that time period.

While plaintiff was preparing to leave the office that day, another incident occurred wherein plaintiff, upon being instructed by Custance to leave without doing any more work, immediately tore up a stack of postcards she had previously stamped and prepared to send to customers before she left for the day. Custance then asked plaintiff to remain in the office because he was going to call Associate Relations about the incident. Custance and plaintiff spoke with Groves and explained what happened.

On Monday, June 21, 2004, plaintiff arrived at work and discovered Custance had changed the office voicemail password. Jones was upset by this, but Custance insisted he had the right to change the password. Plaintiff and Custance placed another call to Groves and Coppotelli at headquarters, whereupon Coppotelli questioned plaintiff about the postcard incident. Plaintiff apologized for that and for her use of expletives earlier that month.

Coppotelli then told plaintiff that, based on her insubordination regarding the postcards, her history of foul language, and her ongoing and unprofessional behavior, Edward Jones was terminating her employment immediately. Coppotelli did not include timecard falsification as a reason for her discharge was that this was Coppotelli's first day back in the office and, he had not yet completed the investigation of that matter. However, Coppotelli did note that Jones's timecard falsification was a serious matter for which she would and could have been discharged.

After discharging plaintiff, defendant utilized 3 "on-call" BOAs (Mary Custance, Danielle Spiegler and Catherine Custance, all of whom are related to Custance) to cover the

Reisterstown branch until a new full-time BOA was hired.[7] Custance's wife, Mary Custance, had worked on occasion when Jones was off work starting on June 18, 2003, and Jones had trained Ms. Custance in March 2004. Mary Custance is a white female under the age of 40. Danielle Spiegler, Custance's sister, is a white female under the age of 40. Catherine Custance, Custance's mother, is a white female over 40 years of age.

Mary Custance did not replace Jones as the full-time BOA. In November 2004, based on a recommendation from Edward Jones's Frederick, Maryland office, Custance hired LeAnne Powell, a white female under 40 years of age, as the full-time BOA for Reisterstown.

## II.

To survive summary judgment on her gender-based hostile work environment claim, plaintiff must demonstrate she suffered workplace harassment that was (1) unwelcome; (2) based on sex; (3) sufficiently severe and pervasive to alter the conditions of employment and create an abusive environment; and (4) that there is some basis for imposing liability on the employer. *See White v. BWI Waste Services, LLC*, 375 F.3d 288, 296-97 (4th Cir. 2004); *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir.1998); *Baqir v. Principi*, 434 F.3d 733, 746, n. 14 (4th Cir. 2006) (stating, without deciding, that a hostile work environment claim is generally cognizable under the ADEA for plaintiffs age 40 or older).

---

[7] "On-call" BOAs work in the office as available, when needed, to cover when a full-time BOA is absent. Typically, an "on-call" BOA may work only one week per year and is compensated based on the number of hours worked.

Courts determine whether an environment is sufficiently hostile or abusive by looking at all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See Farragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). The harassment must be both objectively and subjectively severe and pervasive. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). However, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Farragher*, 524 U.S. at 788. The Fourth Circuit has clarified that rude treatment by supervisors is "conduct falling short of that required to sustain a hostile work environment claim." *Baqir* at 747.

Nowhere in plaintiff's briefings does Jones explain precisely how Custance created a hostile work environment cognizable under Title VII. In fact, Jones's Memorandum simply lays out the four-part "hostile work environment" test enumerated in *White* and *Hartsell* and then states, without more, that Jones was (1) "continuously harassed in June 2004;" and (2) "continuously objected to the hostile work environment she endured, and that interfered with her work performance." Manifestly, there is no evidence in the record to suggest Custance subjected Jones to a cognizable hostile work environment. At most, Jones cites a handful of "isolated instances"[8] which, even if understood by Jones to be rude or unwelcome (thereby

---

[8]Presumably in further support of her hostile work environment claim, plaintiff notes that Custance (1) "would only use the intercom to speak with Jones" (without citing how often this
(continued...)

satisfying the first element of a hostile environment claim), that *Farragher* and *Baqir* explicitly characterizes as insufficient to warrant discriminatory action. 524 U.S. at 787-88.

As to the second and third elements of her claims, not one of the enumerated instances was even remotely based on sex (or race or age, and Jones has not even asserted hostile environment claims on such bases);[9] nor are they in any way indicative of harassment that is "sufficiently severe and pervasive to alter the conditions of employment and create an abusive environment." Plaintiff having failed to project evidence that would satisfy the test for hostile work environment, summary judgment as to that claim shall be granted in favor of defendant.

---

[8](...continued) actually occurred); (2) that, on one occasion Custance told Jones he "couldn't stand the sound of her voice;" (3) that, on one occasion Custance told Jones to "get out of the office;"(4) that it "wasn't uncommon for Custance to tell Jones to go home during business hours;" and (5) that, when Custance was scheduled to be away at a regional conference, Jones was told to take the rest of the week off. As a matter of law, neither singly nor in the aggregate do these incidents rise to the level of a hostile work environment under federal law.

[9]Plaintiff testified that Custance never used any racial terms towards plaintiff and made no racial comments, with one exception. Plaintiff testified that, on one occasion, she overheard "bits and pieces" of a telephone conversation in which Custance allegedly commented that his office might gain more business if he had a white receptionist. Jones does not know who Custance was speaking with, nor did she ever report the instance to defendant Edward Jones. Jones did not cite this alleged conversation in her EEOC complaint. However, even if plaintiff were afforded the benefit of the doubt, *Erangua v. Grafton School, Inc.*, 181 F. Supp. 2d 514, 521 (D. Md. 2002), explicitly states that "[t]o prove discriminatory animus, the derogatory remark cannot be stray or isolated and 'unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of discrimination.'" Even if Jones could establish Custance actually made this statement, there is not a scintilla of evidence suggesting it was related to defendant's decision to terminate Jones.

III.

A plaintiff asserting a claim of disparate treatment discrimination may avert summary judgment using one of two avenues of proof: the "mixed-motive" method or the "pretext" framework. *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 284 (4th Cir. 2004). In a mixed-motive case, a plaintiff may establish a claim by producing direct or circumstantial evidence that discrimination motivated the employer's adverse decision. *Id.* To prevail, the employee need not demonstrate that the prohibited characteristic was the *sole* motivating factor, so long as it was *a* motivating factor. In mixed-motive cases, it is sufficient for the individual to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons. *See* 42 U.S.C. § 2000e-2(m); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989).[10]

Alternatively, a plaintiff may proceed under a "pretext" framework: after establishing a *prima facie* case of discrimination, the burden shifts to the employer to establish a legitimate, non-discriminatory reason for the action, whereupon a plaintiff may demonstrate that the profferred reason is actually only a discriminatory pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973). At all times, the plaintiff retains the burden of persuasion. *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

---

[10]Recently, in the unreported opinion in *Ruff v. Target Stores, Inc.*, 2007 WL 805827, *10 (4th Cir., March 14, 2007), the Court expressly declined to consider whether the relaxed proof standard applied in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003), should apply in an age discrimination case.

In the instant action, plaintiff fails to present evidence of age-, race- or sex-based discrimination sufficient to defeat summary judgment under either test: "mixed-motive" or "pretext." Accordingly, summary judgment shall be granted in favor of defendant.

Plaintiff has produced no direct or circumstantial evidence of discrimination, thus, her success hinges on application of the *McDonnell Douglas* burden-shifting framework. Under *McDonnell Douglas*, Jones must first establish a *prima facie* case by demonstrating: (1) she is a member of the protected class; (2) she was qualified for the position and met the employer's legitimate expectations; (3) she was discharged despite her qualifications; and (4) following her discharge, she was replaced by someone outside of the protected class, or under circumstances that rationally support an inference of discrimination. *See Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002) (*prima face* case of race discrimination); *Hill* at 285 (*prima facie* case of sex discrimination); *Warch v. Ohio Casualty Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006) (*prima facie* case of age discrimination).

Although Jones was (1) a member of the relevant protected classes (Jones is an African American over forty years old); (2) discharged from her employment; and (3) ultimately replaced by someone under the age of 40, plaintiff nonetheless fails to establish a *prima facie* case based on race or age because she was not meeting Edward Jones's legitimate expectations at the time she was terminated.

As to the *prima facie* race-based discrimination claim, plaintiff relies on two independent and unsupported assertions: (1) that Jones was one of only two black female BOAs in over 43 Edward Jones locations; and (2) plaintiff's statement that, "[u]pon

information and belief, [she] was terminated because of her race, so that a white female could replace her." In fact, however, the record is replete with evidence of Jones's unacceptable work performance: excessive absenteeism, failure to complete her job duties in an acceptable manner, engaging in insubordinate behavior with her supervisor, timecard falsification, and making inappropriate comments in the workplace.[11] (Defendant does not rely on the timecard issue, as that issue was still under investigation when plaintiff was terminated.)

Jones provides no evidence to dispute her poor performance or the impact it had on the business. She characterizes the 2004 appraisal as "untrue" (without providing specifics as to why), she does not dispute that she was regularly absent, she admits she falsified her timecards, she admits to an outburst of profanity in the office and to destroying her work product, postcards that were ready to be mailed to customers. Furthermore, it is well-settled that Jones's own testimony does not alone suffice to create a genuine dispute of material fact as to whether plaintiff was meeting defendant's legitimate expectations. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *Evans v. Technologies Applications and Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff"); *Hawkins v. PepsiCo., Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (disregarding plaintiff's opinions of her own performance because "it is the perception of the decision maker which is relevant, not the self-assessment of the

---

[11]Defendant also notes Jones's 2004 performance appraisal which cited plaintiff's failure to review the investment objectives of defendant's customers to deepen customer relationships, failure to follow up with clients by sending letters and making phone calls, forgetting (or not prioritizing) to complete assigned tasks, and failure to get correspondence approved by defendant's compliance office.

plaintiff"). Accordingly, plaintiff has failed to establish a *prima facie* case of race- or age-based disparate treatment discrimination under federal law.[12]

IV.

For the reasons set forth above, the motion for summary judgment shall be granted. *See* Fed.R.Civ.P. 56. An order follows.

Filed: June 25, 2007
                                          /s/
                                          Andre M. Davis
                                          United States District Judge

---

[12]Even if plaintiff could establish a *prima facie* case of discrimination, Jones still cannot demonstrate by a preponderance of the evidence that defendant's legitimate non-discriminatory reasons for her discharge constitute "pretext." *See Hill*, 354 F.3d at 285. Defendant posits (and plaintiff does not dispute) that plaintiff acted inappropriately in the office, was insubordinate to her supervisor, failed to adequately perform her job duties, tore up a stack of postcards that were supposed to be mailed to customers, failed to meet her performance expectations (even after being given the chance to improve), and missed an inexcusable amount of time from work.

     To demonstrate these reasons are mere "pretext" for discrimination, Jones must show that the employer's explanation is "unworthy of credence" or offer "other forms of circumstantial evidence sufficiently probative of discrimination." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (citing *Burdine*, 450 U.S. at 256). Here, regardless of whether Jones subjectively believes the aforementioned incidents warranted discharge, she does not deny that they occurred. Defendant's decision to discharge plaintiff was based on myriad legitimate non-discriminatory reasons which courts may not second-guess. *See DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[t]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination); *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 277 (4th Cir. 1995) (recognizing the "importance of giving an employer the latitude and autonomy to make business decision" so long as they are not discriminatory).